1  Michael Valentine | Amanda Hubbard

2  1371 N Roosevelt Ave

3  Fresno, CA, 93728

4  559-970-1968 | 559-709-4167

5  redwoodlovesong@gmail.com | amandahubbard14@gmail.com

6  MICHAEL VALENTINE, IN PRO PER

7  AMANDA HUBBARD, IN PRO PER

8

**FILED**

**JUL 0 1 2025**

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

9               **UNITED STATES DISTRICT COURT**

10      **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

11

12

| | |
|---|---|
| 13  **MICHAEL VALENTINE and** | ) Case No.: 1:25-cv-00798 KES-HBK |
| 14  **AMANDA HUBBARD,** | ) |
| 15  *Pro Se, Plaintiffs,* | ) **VERIFIED COMPLAINT FOR** |
| 16      vs. | ) **DAMAGES AND INJUNCTIVE** |
| 17  **GRANVILLE REALTY, INC.; GRANVILLE** | ) **RELIEF [EX PARTE]** |
| 18  **PROPERTY MANAGEMENT, INC.;** | ) |
| 19  **GRANVILLE HOMES, INC.; GRASS** | ) **DATE:** _____ |
| 20  **VALLEY INVESTMENTS, LLC; JEFFREY** | ) **TIME:** _____ |
| 21  **ALLEN RUSSELL, individually and as** | ) **DEPT:** _____ |
| 22  **General Counsel; DARIUS ASSEMI,** | ) |
| 23  **individually and as President; ADRIANA** | ) Judge: |
| 24  **RIVERA, individually and as Supervisor;** | ) Dept: |
| 25  **MELISSA D'AMBROSI, individually and as** | ) Action Filed: |
| 26  **Division Manager; and DOES 1-100, inclusive** | ) Trial Date: |
| 27  *Defendants.* | ) |

28

---

[EX PARTE] Complaint for Damages and Injunctive Relief                    - 1 -

## [EX PARTE] VERIFIED COMPLAINT FOR DAMAGES
## AND INJUNCTIVE RELIEF - JURY TRIAL DEMANDED

**I. NATURE OF THE ACTION**

1. This civil rights and racketeering action seeks redress for an active and ongoing criminal enterprise that continues to defraud a 100% service-disabled United States Army veteran through a systematic illegal rental scheme, having collected over $92,539.81 in rent payments and additional fees for property lacking required certificates of occupancy while subjecting him to disability discrimination and retaliatory eviction timed to coincide with his prescribed emotional support animal's terminal illness.

2. Defendants operate through a network of interrelated corporations and shell entities to systematically rent uninhabitable properties to vulnerable tenants, engage in disability discrimination, and obstruct justice through document fabrication when their illegal conduct is discovered.

3. This is not historical misconduct. The enterprise's documented predicate acts include violations of federal criminal law continuing through the present day, with the most recent wire fraud occurring June 29, 2025, as Defendants used interstate email systems to transmit falsified financial ledgers to protect their illegal rental scheme despite actual knowledge of the property's illegal status.

**II. JURISDICTION AND VENUE**

4. This Court has federal question jurisdiction under 28 U.S.C. § 1331 based on claims arising under:
   - The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1964
   - The Fair Housing Act, 42 U.S.C. § 3601 et seq.
   - The Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

5. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a) as they form part of the same case or controversy.

6. Venue is proper under 28 U.S.C. § 1391(b)(2) as all defendants reside in this judicial district and the events giving rise to these claims occurred in Fresno County, California.

7. Urgent judicial intervention is required as Defendants continue committing federal crimes through the present day, including wire fraud as recently as June 29, 2025, while threatening imminent eviction on July 7, 2025.

## III. PARTIES

### A. Plaintiffs

8. Plaintiff MICHAEL VALENTINE is a natural person and resident of Fresno County, California. He is a 100% permanently and totally disabled United States Army veteran, rated by the Department of Veterans Affairs as totally disabled effective March 19, 2019, for service-connected conditions including chronic sleep impairment, anxiety, and impaired judgment.

9. Plaintiff AMANDA HUBBARD is a natural person and resident of Fresno County, California. She is Mr. Valentine's domestic partner and co-tenant at the subject property.

### B. Defendants

10. Defendant GRANVILLE REALTY, INC. is a California corporation with its principal place of business at 1306 W Herndon Avenue, Suite 101, Fresno, California. At all relevant times, Granville Realty served as the property management company for the subject property.

11. Defendant GRANVILLE PROPERTY MANAGEMENT, INC. is a California corporation with its principal place of business at 1306 W Herndon Avenue, Suite 101, Fresno, California, sharing executive personnel, office space, and management systems with Granville Realty.

---

[EX PARTE] Complaint for Damages and Injunctive Relief                          - 3 -

12. Defendant GRANVILLE HOMES, INC. is a California corporation with its principal place of business at 1306 W Herndon Avenue, Suite 101, Fresno, California, operating as part of the integrated Granville enterprise.

13. Defendant GRASS VALLEY INVESTMENTS, LLC is a California limited liability company that acquired title to the subject property on or about July 19, 2022, while continuing to utilize Granville's property management services and systems.

14. Defendant JEFFREY ALLEN RUSSELL is an individual who serves as General Counsel for the Granville enterprise and as registered agent for numerous related entities. He is sued in both his individual and official capacities.

15. Defendant DARIUS ASSEMI is an individual who serves as President of Granville Homes, Inc. and maintains controlling interests in multiple related entities operating from the same business addresses. He is sued in both his individual and official capacities.

16. Defendant ADRIANA RIVERA is an individual who served as a property management supervisor for Granville with authority over tenant communications and maintenance decisions. She is sued in both her individual and official capacities.

17. Defendant MELISSA D'AMBROSI is an individual who served as Division Manager for Granville Property Management during the relevant period. She is sued in both her individual and official capacities.

18. The true names and capacities of Defendants DOES 1 through 100 are unknown to Plaintiffs at this time. Plaintiffs will seek leave to amend this complaint when their identities are ascertained.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. Valentine's Protected Status and Tenancy

19. On July 9, 2019, the Department of Veterans Affairs prescribed an emotional
support animal for Mr. Valentine as disability-related assistance to mitigate his
service-connected disabilities, establishing his ESA's protected status under
federal disability laws.

20. On September 23, 2019, Mr. Valentine disclosed his disability status to
Defendants' agents during the rental application, informing them he was a fully
and permanently disabled veteran receiving VA disability benefits. Defendants
accepted this information and approved his tenancy based on his VA income.

21. During the initial property walkthrough, Mr. Valentine showed Defendants'
agents documentation regarding his VA-prescribed emotional support animal
named Soi Fon, establishing Defendants' actual knowledge of their
accommodation obligations under federal law.

22. On October 15, 2019, Plaintiff Valentine moved into the property located at 1371
N Roosevelt Avenue, Fresno, California, paying a security deposit of $2,000 on
October 1, 2019, before moving in October 15, 2019 agreeing to monthly rent of
$1,375. Valentine paid $750 for October 15, 2019 - October 31, 2019 and was
promised a prorated credit back that was never delivered.

**B. The Illegal Rental Scheme and Certificate of Occupancy Fraud**

23. Unknown to Plaintiff at the time of rental, the subject property lacked a
Certificate of Occupancy required for legal habitation under California Health and
Safety Code § 17920.3, rendering the tenancy void as a matter of law.

24. On June 2, 2025, Defendant Rivera admitted in writing that "The home will not
be able to be legally sold... without a certificate of occupancy," thereby
confirming Defendants' knowledge that they had been collecting rent for 67.5
months on a dwelling that could not legally be rented.

25. Public records reveal that Grass Valley Investments owns at least four properties
in Fresno that lack required Certificates of Occupancy, all of which are managed

---

[EX PARTE] Complaint for Damages and Injunctive Relief          - 5 -

1   by the Granville enterprise: 1371 N Roosevelt Avenue, 5906 E Burns Avenue,

2   739 E Lansing Way, and 11364 N Via Ventana Way.

3   26. All four properties were purchased on the same date, July 19, 2022,

4   demonstrating a coordinated acquisition of properties known to lack legal

5   occupancy certification.

6   27. Despite knowing the property could not legally be rented, Defendants continued

7   to demand rent, by way of sending automated payment reminders as recently as

8   June 29, 2025, 30 days after being informed of the property's illegal status.

9   **C. The Criminal Enterprise Structure**

10  28. Defendants operate as an association-in-fact enterprise within the meaning of 18

11  U.S.C. § 1961(4), sharing common ownership, management personnel, office

12  facilities, and the AppFolio property management platform.

13  29. Defendant Russell serves as registered agent for at least 49 interrelated shell

14  entities, all operating from the same business address and engaged in real estate

15  activities throughout the Central Valley.

16  30. The enterprise's pattern of racketeering activity is corroborated by litigation filed

17  by family insider Kevin Assemi against other family members controlling the

18  enterprise, explicitly alleging RICO violations and wire fraud through the same

19  network of entities.

20  31. Russell has been sanctioned by regulatory authorities including FINRA for 657

21  unauthorized trades affecting over 610 customers, resulting in his termination

22  from Morgan Stanley on May 26, 2021.

23  32. On April 29, 2022, the California Department of Real Estate issued a Desist and

24  Refrain Order against Russell, Darius Assemi, and the Granville entities for

25  illegal subdivision marketing activities.

26  **D. Systematic Habitability Violations**

27

28

---

33. Beginning November 12, 2019, less than one month after move-in, the property's sole bathroom began flooding due to defective plumbing. Defendants' agents acknowledged such flooding was "common with these older homes," demonstrating prior knowledge of systematic defects.

34. From January 11-14, 2020, Defendants delayed three days before addressing a hissing water heater that posed immediate safety risks, resulting in crawl space flooding that required industrial fans for ten days.

35. Water bills showed consumption of 28,708 gallons in a single month—over 18,000 gallons above normal usage—confirming massive leaks attributable to Defendants' deferred maintenance.

36. On June 24, 2025, Code Enforcement Case No. E25-06486 documented sixteen separate violations affecting every major building system including plumbing, electrical, structural, and safety components.

37. Beginning March 29, 2020, Defendants abandoned all landscaping maintenance until August 10, 2020, allowing the property to deteriorate for more than 120 days while continuing to collect full rent.

**E. Communication Obstruction and False Advertising**

38. Defendants advertise "24/7 Emergency Maintenance" services on their website and in rental materials, a representation that is materially false.

39. Between July 2024 and June 2025, Plaintiffs placed 35 documented phone calls to Defendants' advertised business number during office hours: calls that were never answered or returned, including calls during active maintenance emergencies.

40. Defendant agents implemented an anonymous communication system whereby Defendant Rivera admitted "ANY agent can respond" to tenant communications, preventing accountability and enabling systematic retaliation.

41. When Plaintiff(s) attempted to address violations, Rivera repeatedly stated "I'm not gonna go back-and-forth with you," establishing an institutional policy of refusing good faith communication with tenants asserting their rights.

**F. Disability Discrimination and ESA Targeting**

42. When Plaintiff(s) requested reasonable accommodations for Valentine's prescribed emotional support animal, Defendants anonymously responded "per my supervisor" that such accommodations would be denied, demonstrating an institutional policy of discrimination.

43. On March 11, 2025 and March 17, 2025, Valentine told his father that Defendants' conduct was exacerbating his mental health symptoms and depression, establishing the foreseeability of harm from their discriminatory actions.

44. On April 8, 2025, Valentine's emotional support animal Soi Fon was diagnosed with terminal kidney failure, with veterinary records showing critical values requiring emergency intervention costing $1,695.49.

45. On April 9, 2025, while at the emergency veterinary clinic with his dying emotional support animal, Valentine informed Defendants' maintenance worker Adam of the crisis.

46. During the April 9, 2025 veterinary emergency, Defendants' maintenance worker made multiple calls demanding Valentine's attention while he was attempting to provide critical treatment for his prescribed emotional support animal.

47. On April 23, 2025, fourteen days after learning of the emotional support animal's terminal diagnosis on April 9, 2025, Defendants issued a "notice of sale" initiating eviction proceedings against Plaintiffs, demonstrating calculated targeting during Valentine's period of maximum vulnerability.

48. The eviction notice was issued just four days after Defendants failed to meet a Code Enforcement deadline for repairs on April 19, 2025, establishing dual retaliatory motives.

49. Valentine's emotional support animal was euthanized on May 30, 2025, the same day he made a formal written demand for complete rental records.

**G. Evidence Fabrication and Obstruction of Justice**

50. On May 15, 2025, Valentine requested complete rental payment records via email as directed by text message from Danielle Falaschi (dfalaschi@granville.com).

51. On May 16, 2025, Defendant Rivera claimed Defendants had "no access to the previous system" and could not provide records prior to 2022.

52. After Valentine made a formal legal demand on May 30, 2025, Defendants suddenly "discovered" and produced purportedly complete "historical" ledgers on June 8, 2025.

53. Forensic analysis of these ledgers reveals they were created on both the same day they were requested (May 15, 2025) and after a formal litigation hold request on May 30, 2025 (the day of Valentine's emotional support animal's euthanasia).

54. The dates are both in the title of the files sent to the plaintiffs, and in the lower left hand corners of all three documents. Ledger with "Creation Date: May 15, 2025" was created the same day the first request was made. Two ledgers with "Creation Date: June 8, 2025" were later produced for 2 ledgers spanning 2019-2022.

55. Defendants include full names of previous co-tenants unnecessarily, including incorrect tenant move-in and move-out dates that are impossible when confirmed through contemporaneous text confirmations with Granville not matching even the correct year of tenancy changes.

56. The fabricated ledgers contain mathematical impossibilities, including Reference #10573 appearing as both a $7,500 debit from Valentine and a $7,500 credit to Valentine.

57. The same rental unit is coded three different ways within the fabricated documents, demonstrating manipulation to obscure the actual transaction history.

58. Despite the obvious fabrication, Defendant Rivera certified these documents as "proper and correct ledgers" on June 12, 2025.

**H. Pattern of Continuous Wire Fraud and Money Laundering**

59. Defendants illegally collected at least 70 payments through various methods, totaling $92,539.81 in rent payments and additional fees, a $2,000 deposit, and a $40 application fee.

60. Of these payments, 65 were collected through interstate electronic banking systems via ACH and EFT transfers totaling $84,264.81. Each electronic rent payment for the illegally-rented dwelling constitutes a separate act of wire fraud under 18 U.S.C. § 1343, as Defendants used interstate commerce to execute their scheme to defraud.

61. The remaining $8,275 was collected through 6 money order payments and additional fees (six rental payments of $1,375 + one $25 NSF), each processed through interstate banking systems when deposited, constituting separate acts of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i).

62. Defendants transmitted the fabricated ledgers via interstate electronic communications on June 8, 2025, constituting additional predicate acts of wire fraud.

63. Each electronic transfer and money order deposit constitutes money laundering under 18 U.S.C. § 1956, as Defendants knowingly conducted financial transactions involving proceeds of unlawful activity (rental income from illegal dwelling), with intent to conceal the nature and source of the proceeds by processing them through legitimate banking channels.

64. In total, Defendants committed at least 67+ distinct predicate acts of racketeering activity: 67+ acts of wire fraud (65+ electronic transfers plus 2 fabricated ledger

1    transmissions), and potentially 71 acts of money laundering for illegally collected

2    rental monies, along with multiple acts of obstruction of justice through evidence

3    fabrication.

4    **I. Continuous Rolling Criminal Activity and Statute of Limitations Tolling**

5    65. This is not a historical fraud case. Defendants continue committing identical

6        federal crimes through the present day, demonstrating an active criminal

7        enterprise requiring immediate intervention.

8    66. Rolling pattern of continuous criminality: As recently as June 29, 2025—30 days

9        after being informed the property lacks required occupancy certification—

10       Defendants transmitted automated rent demands via interstate commerce,

11       constituting continued attempts to illegally collect rent.

12   67. Tenant Valentine attempted move out in April 2020 resulted in split payments for

13       that month of rent. Along with the $2,000 deposit and $40 application fee. This

14       amounted to 71 individual corroborating bank transactions documented by the

15       plaintiff.

16   68. Each monthly rent collection via ACH/EFT represents a distinct wire fraud

17       predicate act. The 65 separate electronic rental collections constitute ongoing

18       federal crimes, with the most recent occurring within the current limitations

19       period.

20   69. Continuous conspiracy doctrine protection: This rolling pattern of continuous

21       criminality ensures the entire scheme falls within applicable statutes of limitations

22       while demonstrating ongoing threat to additional victims.

23   70. Active enterprise operations: The enterprise's continuing operation through the

24       same management structure (Russell, Assemi, Rivera, D'Ambrosi, Falaschi) and

25       platform (AppFolio) proves this remains an active criminal conspiracy rather than

26       completed historical misconduct.

27

28

71. Ongoing money laundering scheme: Each processing of illegal rental proceeds through legitimate banking channels potentially constitutes a separate money laundering violation, with violations continuing through July 2025 through other illegal rental properties.

**J. Prior Regulatory Violations**

72. Defendant Russell's prior FINRA sanctions for unauthorized trading and failure to report customer complaints demonstrates a pattern of fraudulent conduct and disregard for regulatory requirements.

73. The California Department of Real Estate's April 29, 2022 Desist and Refrain Order against Russell, Darius Assemi, and the Granville entities for illegal subdivision marketing establishes their willingness to violate real estate laws for profit.

74. Properties were transferred between Granville related and Assemi-owned entities (FFDA Properties to Triad Investments to Grass Valley Investments) during the period of regulatory sanctions, demonstrating efforts to evade oversight.

**K. Financial Distress and Asset Dissipation Risk**

75. Based on available public information, the Assemi enterprise has experienced significant financial difficulties, attempting to sell tens of thousands of acres in farmland to correct more than $770 million in defaulted loans, creating urgent liquidity needs and demonstrating the enterprise's financial instability.

76. The coordinated purchase of four properties lacking Certificates of Occupancy on a single day suggests an organized effort to generate revenue through illegal rentals to address the enterprise's financial distress.

77. The enterprise's reported financial distress creates an imminent risk of asset dissipation that could render any judgment uncollectible, necessitating immediate judicial intervention to preserve assets.

78. Defendants have been informed of pending litigation after evidence spoilation and financial document fabrication, demonstrating urgency in liquidating the property before judicial review.

79. As recently as March 17, 2025, Defendant Russell has continued to form LLCs with participant Darius Assemi (owner of Granville Homes and named in the same Desist and Refrain Order from the California Department of Real Estate), demonstrating intent to further dissipate assets to shield them from liability.

**L. Damages and Ongoing Harm**

80. Plaintiffs have paid $92,325 in rent for an illegally-rented dwelling over 67.5 months ($750 for October 2019 + $1,375 for 67 months, -$550 flood credits).

81. Plaintiff Valentine paid $2,000 as a security deposit that Defendants wrongfully retain.

82. Valentine has suffered severe emotional distress from the targeting of his disability and the death of his prescribed emotional support animal, requiring ongoing psychiatric treatment and medication adjustments.

83. The fabricated rental records prevent Plaintiffs from qualifying for alternative housing, causing ongoing damages.

84. Plaintiffs face imminent homelessness with the July 7, 2025 eviction date, just seven days from the filing of this action.

85. The continuing operation of Defendants' criminal enterprise poses ongoing threats to Plaintiffs and other vulnerable tenants throughout the Central Valley, necessitating immediate judicial intervention and injunctive relief.

**V. CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Civil RICO Violations (18 U.S.C. §§ 1961-1964)**

*(Against All Defendants)*

1    86. Plaintiffs reallege and incorporate paragraphs 1-85 as though fully set forth
2        herein.
3    87. Defendants constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4)
4        as an association-in-fact of corporations and individuals sharing common
5        ownership, management personnel, office facilities, and the AppFolio property
6        management platform.
7    88. Defendant Russell serves as registered agent for at least 49 interrelated shell
8        entities, all operating from the same business address and engaged in coordinated
9        real estate activities throughout the Central Valley.
10   89. The enterprise engaged in a "pattern of racketeering activity" within the meaning
11       of 18 U.S.C. § 1961(5) through at least 67+ predicate acts continuing through the
12       present day, including:
13   •  Wire fraud under 18 U.S.C. § 1343 through interstate collection of rent for illegal
14      dwellings (67+ acts: 65+ ACH/EFT transfers plus 2 multi-victim fabricated ledger
15      transmissions)
16   •  Money laundering under 18 U.S.C. § 1956 through concealment of illegal rental
17      proceeds (potentially 71 acts: 65+ electronic transfers plus 6 money order
18      deposits)
19   •  Obstruction of justice under 18 U.S.C. § 1503 through fabrication of evidence
20   90. These predicate acts constitute a continuing pattern spanning from October 2019
21       through the present day, with the most recent wire fraud occurring June 29, 2025,
22       ensuring the entire scheme falls within applicable statutes of limitations.
23   91. The predicate acts were related and continuous, with common purposes, results,
24       participants, victims, and methods of commission targeting vulnerable tenants
25       through systematic illegal rental operations.

92. Plaintiffs suffered injury to their business and property "by reason of" Defendants' racketeering activity, including $94,579.81 in direct economic losses from the illegal rental scheme.

93. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their actual damages plus costs and reasonable attorney fees.

**SECOND CAUSE OF ACTION**

**Fair Housing Act Violations (42 U.S.C. § 3601 et seq.)**

*(Against All Defendants)*

94. Plaintiffs reallege and incorporate paragraphs 1-85.

95. Valentine is a member of a protected class under the Fair Housing Act as a person with disabilities who requires the use of a prescribed emotional support animal as medical equipment.

96. Defendants violated 42 U.S.C. § 3604(f)(1) by discriminating against Valentine in the terms, conditions, or privileges of rental based on his disability status.

97. Defendants violated 42 U.S.C. § 3604(f)(3)(B) by refusing to make reasonable accommodations in rules, policies, practices, or services when necessary to afford Valentine equal opportunity to use and enjoy the dwelling.

98. Defendants engaged in prohibited retaliation under 42 U.S.C. § 3617 by initiating eviction proceedings just fourteen days after learning of Valentine's emotional support animal's terminal illness, demonstrating intentional targeting during his period of maximum vulnerability.

99. Defendants' discriminatory conduct was intentional, willful, and designed to interfere with Valentine's rights under federal law.

100.     Plaintiffs have suffered damages including emotional distress, economic losses, and loss of housing opportunity as a direct result of Defendants' violations.

101.     Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and attorney fees under 42 U.S.C. § 3613.

# THIRD CAUSE OF ACTION

## Violation of California Consumers Legal Remedies Act (Civil Code §§ 1750-1784)

*(Against All Defendants)*

102.    Plaintiffs reallege and incorporate paragraphs 1-85.

103.    Plaintiffs are "consumers" within the meaning of Civil Code § 1761(d) who sought and acquired services for personal, family, and household purposes.

104.    Defendants engaged in "transactions" within the meaning of Civil Code § 1761(e) involving the lease of services to consumers.

105.    Defendants violated Civil Code § 1770(a)(5) by representing that their rental services had "characteristics, ingredients, uses, benefits, or quantities that they do not have," specifically:

- "Landscape Maintenance Included" - falsely advertised as defendants abandoned all landscaping maintenance beginning March 29, 2020
- "24/7 Emergency Maintenance" - falsely advertised as defendants failed to answer calls during real emergencies, taking days to respond multiple times
- "Professionally Managed" - falsely advertised given systematic violations and fabricated records, and failing to answer or return 35 consecutive phone calls to the advertised office phone line during regular business hours
- All calls pertained to emergency needs for rent payment or habitability. Granville made it a corporate practice to deny direct communication with a disabled tenant, using Plaintiff's voicemails as information to retaliate against them through texts.

106.    Defendants violated Civil Code § 1770(a)(9) by "advertising goods or services with intent not to sell them as advertised," as evidenced by their November 2019 rental listing promising services they systematically failed to provide.

107.     These violations were part of Defendants' systematic scheme to attract vulnerable tenants through false promises while providing substandard services and illegal dwellings.

108.     Plaintiffs justifiably relied on Defendants' misrepresentations in entering the rental agreement and suffered damages as a direct result.

109.     Under Civil Code § 1780, Plaintiffs are entitled to actual damages (with statutory minimum of $1,000), punitive damages, restitution, injunctive relief, and attorney fees.

**FOURTH CAUSE OF ACTION**

**Violation of California False Advertising Law (Business & Professions Code § 17500)**

*(Against All Defendants)*

110.     Plaintiffs reallege and incorporate paragraphs 1-85.

111.     Defendants made statements in their November 2019 rental listing concerning services that were "untrue or misleading, and which [were] known, or which by the exercise of reasonable care should [have been] known, to be untrue or misleading."

112.     Defendants' false advertising included material misrepresentations about:

• Landscape maintenance services that were never consistently provided

• Emergency maintenance availability that was systematically ignored

• Professional management standards that were deliberately violated

113.     Defendants knew or should have known these representations were false when made, as evidenced by their pattern of service failures and systematic violations.

114.     These false advertisements were disseminated to the public through rental listing platforms with intent to induce rental agreements.

115.     Plaintiffs and the public were likely to be deceived by these material misrepresentations.

116.     Plaintiffs suffered damages as a direct result of Defendants' false advertising, including rent paid for services never received.

117.     Defendants' conduct warrants injunctive relief to prevent continued false advertising and civil penalties under Business & Professions Code § 17535.

**FIFTH CAUSE OF ACTION**

**Breach of Implied Warranty of Habitability (California Civil Code § 1941.1)**

*(Against All Defendants)*

118.     Plaintiffs reallege and incorporate paragraphs 1-85.

119.     California law implies in every residential lease a warranty that the premises are habitable and fit for human occupation throughout the tenancy period.

120.     Defendants materially breached this warranty by:

- Renting property without required Certificate of Occupancy under Health and Safety Code § 17920.3
- Maintaining premises with 16 documented code violations affecting every major building system
- Failing to repair systematic plumbing failures causing repeated flooding
- Allowing dangerous electrical, structural, and safety conditions to persist
- Abandoning landscaping maintenance creating health and safety hazards

121.     Defendants had actual notice of these habitability defects through tenant complaints, code enforcement actions, and their own admissions.

122.     Defendants' breaches were substantial and materially affected the habitability of the premises.

---

[EX PARTE] Complaint for Damages and Injunctive Relief          - 18 -

123.    Plaintiffs suffered damages including rent paid for uninhabitable premises, costs of mitigating dangerous conditions, and consequential damages from living in substandard housing.

**SIXTH CAUSE OF ACTION**

**Retaliatory Eviction (California Civil Code § 1942.5)**

*(Against All Defendants)*

124.    Plaintiffs reallege and incorporate paragraphs 1-85.

125.    Plaintiffs engaged in protected activities under Civil Code § 1942.5(c) including:

- Requesting reasonable disability accommodations under federal law
- Complaining about habitability violations and demanding repairs
- Exercising rights under federal and state tenant protection laws
- Seeking accurate rental records and questioning fraudulent charges

126.    Within 180 days of these protected activities, Defendants served eviction notices on April 23, 2025, creating a rebuttable presumption of retaliation under Civil Code § 1942.5(f).

127.    The timing of the eviction notice—fifteen days after Valentine's emotional support animal crisis and 4 days after Defendants missed code enforcement repair deadlines—establishes the retaliatory motive.

128.    Defendants cannot rebut the presumption of retaliation given the clear temporal connection and absence of legitimate business reasons for the eviction timing.

129.    The retaliatory eviction was additionally motivated by Defendants' desire to prevent Valentine from pursuing his legal rights regarding the illegal rental and systematic violations.

130.    Plaintiffs are entitled to damages, injunctive relief, and attorney fees under Civil Code § 1942.5.

**SEVENTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

*(Against All Defendants)*

131.    Plaintiffs reallege and incorporate paragraphs 1-85.

132.    Defendants engaged in extreme and outrageous conduct that exceeded all bounds of decency ordinarily tolerated in a civilized community, specifically:

- Calculated targeting of a disabled veteran during his emotional support animal's terminal crisis
- Interfering with emergency veterinary treatment through harassment calls
- Timing eviction proceedings to maximize psychological harm during grief period
- Fabricating evidence to obstruct federal civil rights proceedings
- Systematically collecting rent for illegal dwelling while denying basic services

133.    Defendants acted with intent to cause severe emotional distress, or with reckless disregard of the probability of causing such distress, as evidenced by the calculated 14-day timeline between ESA diagnosis and eviction notice.

134.    Valentine suffered severe emotional distress that no reasonable person could be expected to endure, requiring ongoing psychiatric intervention, medication adjustments, and documented deterioration of his service-connected mental health conditions.

135.    Defendants' conduct was a substantial factor in causing Valentine's severe emotional distress, with medical records establishing the causal connection between housing-related stress and symptom exacerbation.

136.    The conduct was particularly egregious given Valentine's known vulnerability as a 100% disabled veteran with documented mental health conditions.

**EIGHTH CAUSE OF ACTION**

**Fraud and Concealment**

*(Against All Defendants)*

137.    Plaintiffs reallege and incorporate paragraphs 1-85.

138.    Defendants made material misrepresentations of fact including:

- The property was legally habitable and properly certified for occupancy

- Comprehensive maintenance services would be provided as advertised

- Accurate rental records would be maintained and provided upon request

- The property met all applicable health and safety standards

139.    Defendants knew these representations were false when made, as evidenced by:

- Their June 2, 2025 admission that the property lacked required occupancy certification

- Their systematic pattern of service failures contradicting advertised promises

- Their fabrication of rental records with same-day metadata

- Code enforcement documentation of 16 violations affecting every major system

140.    Defendants concealed material facts including:

- The property's illegal status under Health and Safety Code § 17920.3

- The systematic habitability violations present from the beginning of tenancy

- Their intent to provide substandard services while collecting full rent

- The coordinated nature of their illegal rental scheme across multiple properties

141.    Defendants intended that Plaintiffs rely on these misrepresentations and omissions in entering and continuing the rental agreement.

142.    Plaintiffs justifiably relied on Defendants' misrepresentations to their detriment, paying rent for illegal dwelling and accepting substandard conditions based on false promises.

143.    Plaintiffs suffered damages including rent paid for illegal dwelling, security deposits wrongfully retained, veterinary expenses necessitated by Defendants' negligence ($750), and inability to secure alternative housing due to fabricated records.

**NINTH CAUSE OF ACTION**

**Constructive Eviction**

*(Against All Defendants)*

144.    Plaintiffs reallege and incorporate paragraphs 1-85.

145.    Defendants' acts and omissions substantially interfered with Plaintiffs' use and enjoyment of the premises through:

- Maintaining premises with 16 code violations creating health and safety hazards
- Systematic refusal to provide advertised maintenance services
- Abandoning landscaping maintenance creating unsanitary conditions
- Implementing harassment and discrimination policies targeting disability status
- Fabricating documents and obstructing reasonable accommodation requests

146.    Defendants' conduct effectively deprived Plaintiffs of the beneficial use of the property by creating conditions that would compel any reasonable tenant to abandon the premises.

147.    The interference was substantial, continuing, and of such nature as to defeat Plaintiffs' enjoyment of their rental agreement.

148.    Defendants intended to force Plaintiffs' departure through systematic harassment and provision of uninhabitable conditions, particularly targeting Valentine's disability status.

149.    Plaintiffs are entitled to damages for constructive eviction and injunctive relief to prevent continued harassment.

**TENTH CAUSE OF ACTION**

**Violation of California Civil Code § 1950.5 (Security Deposit Violations)**

*(Against All Defendants)*

150.    Plaintiffs reallege and incorporate paragraphs 1-85.

151.    Defendants collected a $2,000 security deposit subject to the requirements of California Civil Code § 1950.5.

152.    Defendants have failed to return the security deposit within 21 days of any termination of tenancy and have failed to provide the required itemized statement of deductions.

153.    Defendants' retention of the deposit constitutes bad faith given:

- The illegal nature of the rental agreement due to lack of occupancy certification
- The systematic breach of habitability warranties by Defendants
- The retaliatory nature of the eviction proceedings
- The fabrication of rental records to justify wrongful retention

154.    Any claimed deductions from the security deposit are improper given Defendants' material breaches and the void nature of the rental agreement.

155.    Under Civil Code § 1950.5(l), Plaintiffs are entitled to statutory penalties including return of the full deposit plus damages equal to twice the deposit amount.

**ELEVENTH CAUSE OF ACTION**

**Unfair Competition (California Business & Professions Code § 17200)**

*(Against All Defendants)*

156.    Plaintiffs reallege and incorporate paragraphs 1-85.

157.    Defendants engaged in unlawful business practices by violating numerous federal and state laws including RICO, Fair Housing Act, CLRA, False Advertising Law, and habitability statutes.

1    158.    Defendants engaged in unfair business practices that offend established

2         public policy and are immoral, unethical, oppressive, and unscrupulous,

3         including:

4    •  Operating illegal rental scheme targeting vulnerable disabled tenants

5    •  Systematic discrimination based on disability status

6    •  Fabricating evidence to obstruct federal proceedings

7    •  Collecting rent for properties lacking required occupancy certification

8    159.    Defendants engaged in fraudulent business practices likely to deceive

9         members of the public through false advertising of services never intended to be

10         provided as promised.

11   160.    Defendants' unfair competition constitutes a continuing course of conduct

12         affecting multiple properties and numerous tenants throughout their enterprise

13         operations.

14   161.    Plaintiffs suffered injury in fact and lost money as a direct result of

15         Defendants' unfair competition.

16   162.    Plaintiffs seek restitution, injunctive relief, and civil penalties to prevent

17         continued violations.

18   **TWELFTH CAUSE OF ACTION**

19   **Violation of Unruh Civil Rights Act (California Civil Code § 51 et seq.)**

20   *(Against All Defendants)*

21   163.    Plaintiffs reallege and incorporate paragraphs 1-85.

22   164.    Valentine is a member of a protected class under the Unruh Act as a

23         person with disabilities requiring reasonable accommodations.

24   165.    Defendants denied Valentine full and equal accommodations, advantages,

25         facilities, privileges, and services based on his disability status.

26   166.    Defendants' discriminatory conduct included:

27   •  Refusing reasonable accommodations for prescribed emotional support animal

28

1  • Targeting Valentine for eviction during disability-related medical crisis

2  • Implementing policies designed to frustrate disabled tenants' rights

3  • Providing substandard services while collecting full payment

4  167.    Defendants' discrimination was intentional and motivated by bias against

5  Valentine's disability status.

6  168.    Under Civil Code § 52, Valentine is entitled to actual damages and

7  statutory damages of $4,000 for each violation, plus attorney fees.

8  **THIRTEENTH CAUSE OF ACTION**

9  **Violation of California Disabled Persons Act (California Civil Code § 54 et seq.)**

10  *(Against All Defendants)*

11  169.    Plaintiffs reallege and incorporate paragraphs 1-85.

12  170.    Valentine is a "disabled person" within the meaning of Civil Code § 54.1

13  as a person with service-connected disabilities requiring prescribed

14  accommodations.

15  171.    Defendants denied Valentine equal access to housing accommodations

16  because of his disability, in violation of Civil Code § 54.1.

17  172.    Defendants specifically interfered with Valentine's right to be

18  accompanied by his prescribed emotional support animal, violating Civil Code §

19  54.2.

20  173.    Defendants' violations were willful and deliberate, designed to frustrate

21  Valentine's exercise of his statutory rights.

22  174.    Valentine is entitled to actual damages, statutory damages, and attorney

23  fees under Civil Code § 54.3.

24  **FOURTEENTH CAUSE OF ACTION**

25  **Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**

26  *(Against All Defendants)*

27  175.    Plaintiffs reallege and incorporate paragraphs 1-85.

28

176.       Plaintiffs and Defendants entered into a lease agreement creating
contractual obligations for both parties.

177.       Plaintiffs performed all material obligations under the lease including
timely payment of rent and compliance with lease terms.

178.       Defendants materially breached the express terms of the lease by:

- Failing to provide habitable premises as required by law

- Failing to provide maintenance services as advertised and promised

- Discriminating against Plaintiffs based on disability status

- Retaining security deposits without legal justification

179.       Every contract contains an implied covenant of good faith and fair dealing
requiring parties to refrain from conduct that would deprive the other party of the
benefits of the agreement.

180.       Defendants breached this implied covenant by:

- Concealing the illegal status of the property from Plaintiffs

- Fabricating rental records to obstruct Plaintiffs' contractual rights

- Acting in bad faith to frustrate Plaintiffs' quiet enjoyment of the premises

- Implementing discriminatory policies targeting Plaintiffs' protected characteristics

181.       Defendants' breaches were material and substantial, depriving Plaintiffs of
the essential benefits of their rental agreement.

182.       Plaintiffs suffered damages as a direct result of Defendants' breaches,
including rent paid for uninhabitable premises and consequential damages.

**FIFTEENTH CAUSE OF ACTION**

**Unjust Enrichment**

*(Against All Defendants)*

183.       Plaintiffs reallege and incorporate paragraphs 1-85.

184.    Defendants received and retained benefits from Plaintiffs in the form of rent payments totaling $92,539.81 in rent payments and additional fees over 67.5 months.

185.    These benefits were conferred under circumstances making it inequitable for Defendants to retain them, specifically:

• The property lacked required Certificate of Occupancy rendering the rental illegal
• Defendants systematically breached habitability warranties
• Defendants failed to provide advertised services while collecting full rent
• The rental agreement was procured through misrepresentation and concealment

186.    Defendants appreciated and had knowledge of the benefits conferred by Plaintiffs' rent payments.

187.    It would be unjust and inequitable for Defendants to retain these benefits given the illegal nature of the rental scheme and their systematic breaches of duty.

188.    No adequate remedy at law exists to prevent Defendants' unjust enrichment.

189.    Defendants should be required to make restitution to Plaintiffs for all benefits wrongfully obtained.

**SIXTEENTH CAUSE OF ACTION**

**Nuisance (California Civil Code §§ 3479-3480)**

*(Against All Defendants)*

190.    Plaintiffs reallege and incorporate paragraphs 1-85.

191.    Defendants' maintenance and operation of the property in violation of health and safety codes constitutes a nuisance under Civil Code § 3479.

192.    The nuisance substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their tenancy through:

• 16 documented code violations affecting every major building system
• Persistent plumbing failures creating unsanitary conditions

1  • Electrical and structural defects creating safety hazards

2  • Abandoned landscaping creating pest and health problems

3  193.    Plaintiffs suffered harm of a type that would be suffered by any normal

4       person in the community subjected to such conditions.

5  194.    The gravity of harm to Plaintiffs substantially outweighs any utility of

6       Defendants' conduct in maintaining the property in violation of applicable codes.

7  195.    The nuisance is continuing and will persist absent judicial intervention

8       requiring compliance with health and safety standards.

9  196.    Plaintiffs are entitled to damages for past harm and injunctive relief

10      requiring abatement of the nuisance conditions.

11 **SEVENTEENTH CAUSE OF ACTION**

12 **Intentional Interference with Prospective Economic Advantage**

13 *(Against All Defendants)*

14 197.    Plaintiffs reallege and incorporate paragraphs 1-85.

15 198.    Plaintiffs had prospective economic relationships with alternative housing

16      providers, including the opportunity to secure suitable rental housing.

17 199.    Defendants knew of these prospective relationships or their likelihood, as

18      securing alternative housing is a natural consequence of tenancy termination.

19 200.    Defendants engaged in wrongful conduct specifically designed to interfere

20      with these relationships, including:

21 • Fabricating rental payment records with mathematical impossibilities

22 • Creating false documentation to misrepresent Plaintiffs' tenancy history

23 • Providing inaccurate information designed to prevent qualification for alternative

24   housing

25 • Timing eviction proceedings to maximize difficulty in securing alternative

26   accommodation

27

28

201.    Defendants' conduct was independently wrongful as it violated RICO, consumer protection laws, fair housing laws, and constituted fraud and obstruction of justice.

202.    Actual disruption of Plaintiffs' prospective economic relationships occurred, as the fabricated records prevent qualification for alternative housing and create barriers to securing safe, legal accommodation.

203.    Defendants' interference was a substantial factor in causing economic harm to Plaintiffs.

204.    Plaintiffs suffered economic damages proximately caused by Defendants' wrongful interference, including increased housing costs, inability to secure suitable accommodation, and lost opportunities for improved housing situations.

205.    Defendants' conduct was malicious and designed to maximize harm to Plaintiffs during their most vulnerable period.

**EIGHTEENTH CAUSE OF ACTION**

**Civil RICO Conspiracy (18 U.S.C. § 1962(d))**

*(Against All Defendants)*

206.    Plaintiffs reallege and incorporate paragraphs 1-85 and 86-93.

207.    This claim is brought under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)" of § 1962.

208.    Each Defendant knowingly agreed to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

209.    Each Defendant knew that their co-conspirators were engaged in a pattern of racketeering activity and agreed to facilitate that pattern of activity through their respective roles:

- The corporate defendants provided the infrastructure and systems to collect illegal rents
- Russell provided legal cover and corporate structure for the illegal enterprise
- Assemi provided executive control and coordinated property acquisitions
- Rivera implemented operational policies to obstruct tenant rights and conceal violations
- D'Ambrosi supervised the discriminatory and retaliatory practices
- Falaschi transmitted false financial ledgers to both plaintiffs, creating a multi-victim wire fraud by sending it to both of their respective Gmail accounts
- Grass Valley Investments acquired properties known to lack certificates of occupancy

210.    The existence of the conspiracy is demonstrated by:

- The coordinated purchase of four properties lacking certificates of occupancy on the same date, all transferred to, from, and through Assemi-owned entities
- The systematic use of shared management systems and personnel across entities
- The uniform pattern of collecting rent for illegal properties across the enterprise
- The coordinated response to tenant complaints through obstruction and retaliation
- The enterprise-wide policy of refusing disability accommodations
- The fabrication of evidence when the scheme was discovered

211.    Each Defendant committed overt acts in furtherance of the conspiracy, including but not limited to:

- Processing illegal rent payments through interstate commerce
- Implementing policies to deny disability accommodations
- Fabricating rental records to conceal the conspiracy
- Coordinating retaliatory actions against tenants who complained

212.    The conspiracy's objectives included:

1    • Generating revenue through illegal rental of properties lacking required

2    certifications

3    • Concealing the illegal nature of the rental scheme from tenants and authorities

4    • Maximizing profits by refusing required maintenance and accommodations

5    • Silencing tenant complaints through retaliation and obstruction

6    213.    The ongoing nature of the conspiracy is evidenced by:

7    • Continued collection of rent through June 2025 despite knowledge of illegality

8    • The existence of similar litigation against the enterprise by insider Kevin Assemi

9    • The enterprise's continued operation of multiple properties without certificates

10    • Recent predicate acts including wire fraud on June 29, 2025

11    214.    As co-conspirators, each Defendant is liable for all reasonably foreseeable

12    acts of their co-conspirators in furtherance of the conspiracy, including all 67+

13    predicate acts alleged.

14    215.    Plaintiffs were injured in their business and property by reason of the

15    conspiracy, suffering the same damages alleged in the substantive RICO claim.

16    216.    Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their

17    actual damages plus costs and reasonable attorney fees based on Defendants'

18    conspiracy to violate RICO.

19    **VI. PUNITIVE DAMAGES CONSTITUTIONAL ANALYSIS**

20    **A. Supreme Court Framework**

21    The Supreme Court established three guideposts for reviewing punitive damages: "(1) the

22    degree of reprehensibility of the defendant's misconduct; (2) the disparity between the

23    actual or potential harm suffered by the plaintiff and the punitive damages award; and (3)

24    the difference between the punitive damages awarded by the jury and the civil penalties

25    authorized or imposed in comparable cases." *BMW of North America, Inc. v. Gore*, 517

26    U.S. 559, 575 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418

27    (2003).

28

1    "The most important is the degree of reprehensibility of the defendant's conduct." *State*

2    *Farm*, 538 U.S. at 419.

3    **B. All Five Reprehensibility Factors Present**

4    Courts must "determine the reprehensibility of a defendant by considering whether: the

5    harm caused was physical as opposed to economic; the tortious conduct evinced an

6    indifference to or a reckless disregard of the health or safety of others; the target of the

7    conduct had financial vulnerability; the conduct involved repeated actions or was an

8    isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or

9    mere accident." *State Farm*, 538 U.S. at 419.

10    1. **Physical Harm**: Defendants' conduct exacerbated Valentine's service-connected

11         disabilities, requiring psychiatric intervention and medication adjustments.

12         Threatened homelessness of a disabled person constitutes physical endangerment

13         beyond economic loss.

14    2. **Reckless Disregard**: Defendants neglected at least 16 code violations, refused

15         VA-prescribed disability accommodations, and operated an illegal dwelling

16         without required safety certifications.

17    3. **Financial Vulnerability**: Valentine is 100% service-disabled on fixed VA

18         benefits. Defendants approved his tenancy based on VA income, then exploited

19         that vulnerability. California's Disabled Veterans' Exemption recognizes the

20         special protected status of 100% service-disabled veterans.

21    4. **Repeated Actions**: The record establishes 67+ predicate acts over 68 months, and

22         systematic operation of four properties without certificates of occupancy.

23    5. **Intentional Malice**: Defendants knowingly collected rent for illegal property,

24         fabricated evidence, and timed eviction 14 days after learning of the emotional

25         support animal's terminal diagnosis.

26

27

28

1   "The existence of any one of these factors weighing in favor of a plaintiff may not be

2   sufficient to sustain a punitive damages award; and the absence of all of them renders any

3   award suspect." *State Farm*, 538 U.S. at 419. **All five factors are present here.**

4   **C. California Precedents Supporting High Ratios**

5   California courts have consistently upheld punitive damage ratios exceeding single digits

6   when extreme reprehensibility factors are present:

7   • **Bullock v. Philip Morris USA, Inc.** (2011) 198 Cal.App.4th 543: California

8      Court of Appeal upheld a 16:1 punitive damages ratio, finding that "extreme

9      reprehensibility of Philip Morris's misconduct, including the vast scale and

10     profitability of its course of misconduct" justified the award.

11  • **Nickerson v. Stonebridge Life Insurance Co.** (2013) 219 Cal.App.4th 188:

12     Court of Appeal affirmed a 10:1 ratio for insurance bad faith involving a disabled

13     veteran, emphasizing that "the high level of reprehensibility of Stonebridge's

14     conduct" and targeting of vulnerable populations justified the ratio.

15  • **Neal v. Farmers Insurance Exchange** (1978) 21 Cal.3d 910: California Supreme

16     Court upheld ratios up to 74:1 in cases involving egregious conduct.

17  **D. Comparable Penalties**

18  Relevant statutory schemes authorize substantial penalties:

19  • RICO treble damages (18 U.S.C. § 1964(c))

20  • Unlimited Fair Housing Act punitive damages in federal court (42 U.S.C. § 3613)

21  • California statutory damages for willful violations

22  • Recent Supreme Court decision in *Medical Marijuana, Inc. v. Horn* (2025)

23     permits recovery of treble economic damages in personal injury actions involving

24     RICO elements

25  **E. Enhanced Per Diem Justification: $5,000 Daily**

26  The $5,000 per diem rate for non-economic damages is legally justified based on:

27

28

1.  **Disability Discrimination Precedents**: High per diem rates are justified when permanent disability, high level of physical pain, long recovery period, and impact on mental health including significant anxiety, depression, PTSD are present. Courts recognize emotional distress from disability discrimination can range from $3,000-$6,000 daily when systematic targeting is involved.

2.  **RICO Enterprise Operations**: When a person's business or property is injured because of a RICO violation, that person may recover treble damages as well as reasonable attorney's fees (18 U.S.C. § 1964(c)).

3.  **Valentine's Enhanced Harm Factors:**
    o  100% Service-Disabled Veteran Status - Protected federal class
    o  Breach of trust established from Day 1 racketeering acts
    o  Daily fear and anxiety living in illegal dwelling with 16 code violations
    o  Compounding psychological trauma - Daily stress from 16 code violations in illegal dwelling
    o  Retaliatory eviction - Targeting disabled veteran through illegal eviction after exercising tenant rights

**VII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

**A. MONETARY RELIEF:**

1.  **Economic damages**: $95,329.81 representing all rent and costs paid for illegal dwelling, including $750 in veterinary expenses for flea treatment necessitated by Defendants' failure to maintain habitable premises;

2.  **RICO treble damages**: $285,989.43 under 18 U.S.C. § 1964(c);

3.  **Non-economic damages**: $10,500,000, calculated as $5,000 per day for 2,100 days from October 1, 2019 (security deposit fraud) through July 1, 2025, reflecting the daily psychological harm of unknowingly residing in an illegal dwelling while being systematically defrauded as a disabled veteran;

4. **Punitive damages**: $241,500,000, calculated to achieve a 23:1 ratio reflecting Valentine's 23 unanswered phone calls demonstrating Defendants' complete disregard for a disabled veteran's attempts to resolve habitability issues. a. **Constitutional Foundation**: All five Supreme Court reprehensibility factors from *BMW v. Gore* and *State Farm* are present as detailed above. b. **Proportionality Analysis (23:1 Ratio)**: The 23:1 ratio directly corresponds to the 23 unanswered phone calls from a disabled veteran desperately seeking to resolve habitability issues in an illegal dwelling. This symbolic ratio demonstrates:

- o Defendants' complete disregard for tenant safety and federal disability protections
- o A pattern of willful indifference requiring proportional deterrence
- o Alignment with California precedent upholding ratios up to 74:1 in egregious cases (*Neal v. Farmers Insurance Exchange*)
- o The need for punitive damages that reflect the egregiousness of ignoring 23 separate attempts by a vulnerable victim to address living conditions c. **Defendant's Wealth Capacity**: The total award of $252,285,989.43 represents 12.6% of Defendants' estimated enterprise wealth of $2 billion. This percentage:
- o Is substantial enough to serve as meaningful deterrence without destroying the enterprise
- o Ensures the penalty exceeds a mere "cost of doing business" that previous regulatory fines failed to achieve
- o Falls within ranges courts have approved for systematic fraud targeting vulnerable populations
- o Creates actual financial consequences that will compel compliance with federal law d. **Deterrence Justification**: Previous smaller regulatory penalties (DRE violations, FINRA sanctions) have failed to deter

1                     continued illegal conduct. The award serves to deter similar schemes

2                     across the enterprise's multi-state operations, protecting other vulnerable

3                     tenants from identical systematic fraud.

4 **Total Award**: $252,285,989.43 (Economic trebled under RICO: $285,989.43 + Non-

5 Economic: $10,500,000 + Punitive: $241,500,000)

6 **NOTE ON REMEDIES**: Plaintiffs seek the highest monetary award available under

7 applicable law, whether through RICO treble damages, punitive damages, or statutory

8 penalties, but do not seek to recover duplicative damages for the same conduct. The

9 Court may elect to award the remedy that provides the greatest recovery while avoiding

10 double compensation.

11     5.   Attorney fees and costs under 42 U.S.C. § 3613(c), Civil Code § 1780, Civil Code

12         § 52, Civil Code § 54.3, and other applicable fee-shifting statutes;

13     6.   Pre- and post-judgment interest at the maximum rate allowed by law.

14 **B. INJUNCTIVE RELIEF:**

15     1.   Immediate cessation of all eviction proceedings against Plaintiffs;

16     2.   Mandatory repairs under court supervision to bring property into compliance with

17         all applicable codes;

18     3.   Appointment of a receiver to manage Defendants' rental properties and ensure

19         compliance with law;

20     4.   Permanent injunction prohibiting discriminatory practices and requiring

21         accommodation of disabled tenants;

22     5.   Asset preservation order preventing dissipation of enterprise assets pending

23         resolution;

24     6.   Compliance monitoring to ensure adherence to all applicable housing, consumer

25         protection, and civil rights laws;

26     7.   Such other and further relief as the Court deems just and proper.

27 **JURY DEMAND**

28

1   Plaintiffs demand trial by jury on all issues so triable under the Seventh Amendment to

2   the United States Constitution and Federal Rule of Civil Procedure 38.

3   DATED: July 01, 2025

4   **MICHAEL VALENTINE**

5   *Pro Se Plaintiff*

6   **AMANDA HUBBARD**

7   *Pro Se Plaintiff*

8   **VERIFICATION**

9   I, MICHAEL VALENTINE, declare under penalty of perjury under the laws of the

10   United States of America that I have read the foregoing Complaint, know its contents,

11   and the matters stated herein are true and correct of my own personal knowledge, except

12   as to those matters stated on information and belief, and as to those matters, I believe

13   them to be true.

14   Executed on July 01, 2025, at Fresno, California.

15   **MICHAEL VALENTINE** *Michael Valentine*

16   I, AMANDA HUBBARD, declare under penalty of perjury under the laws of the United

17   States of America that I have read the foregoing Complaint, know its contents, and the

18   matters stated herein are true and correct of my own personal knowledge, except as to

19   those matters stated on information and belief, and as to those matters, I believe them to

20   be true.

21   Executed on July 01, 2025, at Fresno, California.

22   **AMANDA HUBBARD**

23

24

25

26

27

28